Filed 9/7/23; Certified for Publication 9/29/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TINA GLYNN et al., | |
| Plaintiffs and Appellants, | G061255 |
| v. | (Super. Ct. Nos. 30-2019-01111430, 30-2020-01148859) |
| ORANGE CIRCLE LOUNGE INC., et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, James L. Crandall, Judge.  Affirmed.

A. Liberatore and Anthony A. Liberatore for Plaintiff and Appellant Tina Glynn.

Leslie L. Niven for Plaintiff and Appellant David Glynn.

Worthe Hanson & Worthe, Todd C. Worthe and McKenzie C. Foellmer for Defendants and Respondents.

\*         \*         \*

Plaintiffs Tina and David Glynn, parents of decedent Nicholas Glynn (Nicholas),[1] appeal from an order granting a summary judgment motion against them and in favor of defendants Orange Circle Lounge Inc., Lounge Group, Inc., and Mario Marovic, owners and operators of the District Lounge, a bar. Plaintiffs argue the trial court erred in granting summary judgment based on the physical and temporal distance between defendants' bar (at which a fight took place between Nicholas and some assailants) and the subsequent fight a block away and nearly an hour later that resulted in Nicholas's death. We affirm.

FACTS AND PROCEDURAL HISTORY

Nicholas and his friends J.D. and J.B. were patrons at the District Lounge, a bar located on Chapman Avenue in Orange, in the late evening of July 28, 2018, and early morning hours of July 29, 2018. At around 12:15 a.m. on July 29, 2018, a fight broke out between Nicholas and J.D., on the one hand, and several other patrons of the bar, on the other. The fight was broken up by security and the two groups were escorted outside. Another brief altercation may have ensued outside, but was quickly stopped by security, after which the two groups left and went their separate ways. The District Lounge's security or other employees did not call the police.

Nicholas and J.D. walked down the street, turned left, and went to the rear of another bar, where they located another friend. They decided to leave their friend at the bar and return to another friend's house. They looped back around onto Chapman Avenue, approximately a block west of the District Lounge, on the other side of Lemon Street. There, in the parking lot of another business, they encountered their assailants

_____

[1] Though Nicholas is not technically a party to this appeal, we nevertheless use his name throughout this opinion, consistent with our Supreme Court's policy of identifying homicide victims whenever possible. (Cal. Style Manual (4th ed. 2000) § 5.9.)

from the District Lounge Bar fight again. The assailants drove past them and threw a beer bottle, hitting J.D. in the face. Nicholas swore at the assailants, who stopped their car and got out. A fight ensued and Nicholas was stabbed to death.

Plaintiffs sued defendants for wrongful death. Defendants moved for summary judgment, arguing their duty terminated when Nicholas, J.D., and the assailants left the bar separately and peaceably, and did not extend to the subsequent fight a block away and approximately an hour later. The trial court concluded defendants owed no duty to Nicholas because the fatal altercation occurred outside defendants' premises and granted the motion for summary judgment. Plaintiffs timely appealed.

DISCUSSION

On appeal, plaintiffs raise several arguments to attack the trial court's ruling. Plaintiffs' principal argument is that the general duty of ordinary care, codified as section 1714 of the Civil Code, provides the baseline rule and the burden falls on defendants to establish an exception thereto. Plaintiffs further contend this burden is a high one, as "no such exception [to this principle] should be made unless clearly supported by public policy." (*Rowland v. Christian* (1968) 69 Cal.2d 108, 112, superseded by statute on other grounds.) Plaintiffs also point out that such an exception should only be recognized if it constitutes a categorical rule, citing *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 772.

The problem with this argument is that (as defendants point out) just such a categorical rule exists: "The general rule is that a person who has not created a peril is not liable in tort for failing to take affirmative action to protect another unless they have some relationship that gives rise to a duty to act." (*Paz v. State of California* (2000) 22 Cal.4th 550, 558.) Defendants fall into the exception to this rule, as bar proprietors owe a duty arising out of the special relationship created between themselves and their customers. (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235 (*Delgado*).) Thus,

3

the dispositive question here is not how far the duty of ordinary care reaches, but rather the extent of the duty arising out of defendants' special relationship with Nicholas.

As the Supreme Court explained in *Delgado*, past cases have recognized duties of bars to provide "'assistance [to] their customers who become ill or need medical attention,'" "to warn patrons of known dangers [citation] and, in circumstances in which a warning alone is insufficient, . . . to take other reasonable and appropriate measures to protect patrons or invitees from imminent or 'ongoing' criminal conduct. [Citation.] Such measures may include telephoning the police or 911 for assistance [citation], or protecting patrons or invitees from an imminent and known peril lurking in a parking lot by providing an escort by existing security personnel to a car in that parking lot." (*Delgado*, *supra*, 36 Cal.4th at p. 241.)

The facts of plaintiffs' case take them outside these existing duties. Nicholas was not ill and evidently not in need of medical attention at the time he left defendants' bar. Plaintiffs do not argue defendants failed to warn Nicholas of danger. And (contrary to plaintiffs' arguments) the criminal conduct that resulted in Nicholas's injuries and death was neither "ongoing" nor "imminent" at the time he left the bar. Instead, the undisputed evidence was that Nicholas and J.D. left the bar and the assailants left separately; the fight was over, inasmuch as could be determined, and therefore was not "ongoing." Similarly, "imminent" means "ready to take place"; Nicholas and J.D. did not encounter the assailants again while walking around nearby until nearly an hour later. (Merriam-Webster's Collegiate Dict. (10th ed. 1996) p. 580.)

Thus, for plaintiffs to prevail, we must find a duty arising from the bar/patron special relationship beyond those identified in previous cases. To evaluate this question, we apply the factors identified by the Supreme Court in *Rowland v. Christian*, *supra*, 69 Cal.2d 108. The factors are: "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the

4

defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Id.* at p. 113.)

Here, as plaintiffs point out, the harm they suffered was at least arguably foreseeable by defendants. Defendants knew Nicholas had been attacked by the assailants in the bar, and it was foreseeable that further fighting and injuries would happen later outside the bar if the assailants encountered Nicholas again. And it was foreseeable that the assailants would encounter Nicholas again, as all parties left the bar at approximately the same time.

The second factor weighs in favor of finding a duty. Nicholas was killed by the assailants; the harm he suffered is a certainty.

The third factor, by contrast, weighs against finding a duty. Defendants' conduct is quite significantly removed from Nicholas's death by physical distance, time, and the tenuous logic of the causal connection plaintiffs draw between defendants' conduct and Nicholas's death. Plaintiffs argue defendants should have called the police, but it is not at all clear that this would have made any difference in the ultimate outcome.

The fourth factor, moral blameworthiness of the conduct, also weighs against finding a duty. Plaintiffs point out that defendants failed to comply with their safety plan, which specified that police should be called under these circumstances. However, we do not ordinarily define either moral blame or a legal duty by reference to defendants' own internal policy. The lack of a call to 911 when the parties had been separated and had peaceably gone their separate ways is not the sort of conduct to which moral blame ordinarily attaches. One wonders what plaintiffs would have expected defendants to report to the police dispatcher in this instance.

The fifth factor, the policy of preventing future harm, weighs only weakly in favor of finding a duty. Calling the police after the parties left the bar would likely not

have prevented Nicholas's subsequent death. More broadly, calling the police after every bar fight might marginally reduce the frequency and severity of injuries resulting from subsequent altercations, but it seems unlikely to eliminate them. The police cannot and will not arrest or indefinitely detain every person involved in a bar fight, and certainly will not follow participants in bar fights around, in hopes of preventing a future fight.

The sixth factor, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, weighs substantially against imposing a duty. If every bar is required to call the police for every altercation taking place on their premises, on pain of liability attaching for subsequent fights happening much later, away from the premises they own or control, police resources would be stretched thin and the ability of the police to respond to other calls would suffer.[2] Many, perhaps even most, of these calls will be unnecessary. By the time the police arrive, most of these situations will have been calmed by bar security, with the parties either eager to leave or having already left.

The seventh factor, the availability, cost, and prevalence of insurance, weighs weakly in favor of finding a duty. Bars are already insured against many of the risks inherent in their operation. However, imposing a duty as plaintiffs advocate would necessarily entail a significant expansion of the potential scope of a bar's liability, and could therefore significantly increase the price of insurance.

We conclude the balance of these factors weighs against imposing a duty under these circumstances. The foreseeable nature of Nicholas's death, the certainty he suffered an injury, the minimal prevention of future harm, and the existence of insurance are not sufficient to outweigh the tenuous nature of the connection between defendants'

---

[2] In fact, such a duty would probably extend to calling the police at any time the bar anticipates that a fight *might occur*, which would impose an even greater burden on public law enforcement resources. (See *Delgado*, *supra*, 36 Cal.4th at p. 245 [imposing a duty on bar proprietors even in the absence of a previous fight to take steps to protect patrons from imminent assault occurring just outside the bar].)

conduct and Nicholas's death, the absence of moral blame attaching to defendants' conduct, and the substantial burden that imposition of a duty would impose on not only defendants but the community at large through greatly expanded utilization of law enforcement resources.

Instead, we reaffirm the approach described in *Delgado* and other past cases. A bar's duty arising out of its special relationship with its patrons extends to protecting patrons from "imminent or 'ongoing' criminal conduct," but not further. (*Delgado*, *supra*, 36 Cal.4th at p. 241.) When patrons safely and peaceably leave the bar, as Nicholas, J.D., and the assailants did, the bar's special relationship with them terminates, and the duty it owes to them ends.

Plaintiffs' remaining arguments are unavailing. First, plaintiffs argue the trial court erred by focusing exclusively on the location at which Nicholas died and not conducting a *Rowland* analysis. While the trial court's written ruling is consistent with plaintiffs' characterization, the record of the hearing suggests the trial court also conducted a broader review of the state of the applicable case law and the facts. Regardless, our review is de novo, and our conclusion that no duty attaches here is based, in part, on our conclusion that the *Rowland* factors do not support imposition of a duty.

Second, plaintiffs also characterize the trial court's ruling as being improperly based on causation, rather than duty. The intertwining of duty and causation is inherent in analysis using the *Rowland* factors; nevertheless, as plaintiffs concede, *Rowland* is the correct rubric for evaluating whether a duty exists in this context. And again, our review is de novo, so it makes no difference how the trial court reached its conclusion.

Third, plaintiffs contend the evidence supports an inference that the fight was ongoing after Nicholas, J.D., and the assailants left the premises. We disagree. The undisputed evidence established the timing and direction of Nicholas and J.D.'s movements after leaving defendants' bar, as well as the fact they did not see the

7

assailants again until the fatal altercation occurred. Plaintiffs presented no evidence to create a triable issue of material fact over any of these factual issues. Plaintiffs' argument that the assailants may have been "lying in wait or following [Nicholas]," is also entirely speculative and is not supported by any evidence. Nor is it a reasonable inference from the evidence. The undisputed testimony of J.D. was the assailants drove by in a car and threw a beer bottle at Nicholas and J.D., then stopped the car to fight them. This behavior is not consistent with either lying in wait or following Nicholas and J.D. It is just as likely, if not more so, the two groups met again by unfortunate happenstance, which defendants could not be expected to prevent.

In the absence of ongoing or imminent criminal conduct, we cannot find defendants owed a duty to Nicholas to protect him from the assailants during the final altercation. Once Nicholas, J.D., and the assailants left defendants' bar peaceably and in separate directions, the bar's duty ended.

## DISPOSITION

The judgment is affirmed. Defendants shall recover costs on appeal.

SANCHEZ, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

MOORE, J.

8

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TINA GLYNN et al.,<br><br>    Plaintiffs and Appellants,<br><br>        v.<br><br>ORANGE CIRCLE LOUNGE INC., et al.,<br><br>    Defendants and Respondents. | G061255<br><br>(Super. Ct. Nos. 30-2019-01111430, 30-2020-01148859)<br><br>O R D E R |

The Association of Southern California Defense Counsel has requested that our opinion, filed on September 7, 2023, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

                                                SANCHEZ, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.